CAVANAGH, J.
The issue in this case is whether teachers have standing to sue the school board for failing to comply with its statutory duty to expel students who have allegedly physically assaulted those teachers. We hold that the standing doctrine adopted in Lee v Macomb Co Bd of Comm’rs, 464 Mich 726; 629 NW2d 900 (2001), and extended in later cases, such as Nat’l Wildlife Federation v Cleveland Cliffs Iron Co, 471 Mich 608; 684 NW2d 800 (2004), lacks a basis in the Michigan Constitution and is inconsistent with Michigan’s historical approach to standing. Therefore, we overrule Lee and its progeny and hold that Michigan standing *353 jurisprudence should be restored to a limited, prudential approach that is consistent with Michigan’s longstanding historical approach to standing. Under the proper standing doctrine, we further hold that the Court of Appeals erred in determining that plaintiffs lacked standing. Therefore, we reverse and remand to the Court of Appeals to address the parties’ remaining issues, including whether plaintiffs meet the requirements to bring an action for a declaratory judgment under MCR 2.605.
I. FACTS AND PROCEDURAL HISTORY
Plaintiffs are the Lansing School Education Association (LSEA), the Michigan and National Education Associations (MEA/NEA), and four teachers who are employed by defendants, the Lansing School District and the Lansing Board of Education. Each of the four teachers alleges that they were physically assaulted in the classroom by a student who was in grade six or higher, and each of the incidents was reported to a school administrator.[1] The students were suspended but not expelled. Plaintiff Penny Filonczuk alleges that the assaultive student was returned to her building, but not to her classroom, and none of the other teachers alleges that the student was returned to the same classroom or school.
Plaintiffs filed suit, alleging that defendants failed to comply with their mandatory duty under MCL 380.1311a(l) to expel students who physically assault a *354 teacher.[2] They sought a writ of mandamus and declaratory and injunctive relief. In support of the action, three of the teachers filed affidavits stating that they believe that failing to expel students who physically assault a teacher increases the likelihood of other assaults and threatens the safety of the school environment. Plaintiff Filonczuk further stated that she felt discomfort due to the student’s return to her building, and the other two teachers stated that they would have felt unsafe if the students who assaulted them had returned to their buildings.
Defendants moved for summary disposition, arguing that plaintiffs lack standing, the statute does not create a private cause of action, and plaintiffs’ claims fail as a matter of law because the school district did not abuse its discretionary authority in determining that none of the students had committed an “assault.” .The trial court granted the motion, reasoning that the court lacked the authority to supervise the school district’s exercise of its discretion.
Plaintiffs appealed, and the Court of Appeals affirmed the trial court’s grant of summary disposition on different grounds. Lansing Sch Ed Ass’n, MEA/NEA v Lansing Bd of Ed, 282 Mich App 165; 772 NW2d 784 (2009). The Court concluded that plaintiffs lacked standing under Lee and did not reach the case’s merits. This Court granted plaintiffs’ application for leave to appeal. 485 Mich 966 (2009).
II. ANALYSIS
The issue in this case is whether the Lee/Cleveland Cliffs majority erred in adopting a standing doctrine *355 that departed dramatically from Michigan’s historical approach to standing. We hold that they did and that Michigan’s standing doctrine should be restored to an approach that is consistent with the limited, prudential approach used historically. Under this approach, plaintiffs do not lack standing.
A. THE HISTORICAL DEVELOPMENT OF MICHIGAN’S STANDING DOCTRINE
The purpose of the standing doctrine is to assess whether a litigant’s interest in the issue is sufficient to “ensure sincere and vigorous advocacy.” Detroit Fire Fighters Ass’n v Detroit, 449 Mich 629, 633; 537 NW2d 436 (1995). Thus, the standing inquiry focuses on whether a litigant “is a proper party to request adjudication of a particular issue and not whether the issue itself is justiciable.” Allstate Ins Co v Hayes, 442 Mich 56, 68; 499 NW2d 743 (1993) (quotation marks and citations omitted). This doctrine has deep roots in Michigan law, and, although it has been used with increasing frequency in modern jurisprudence, before Lee it remained a limited, prudential doctrine.
Historically, the standing doctrine grew out of cases where parties were seeking writs of mandamus to compel a public officer to perform a statutory duty. See, e.g., People ex rel Ayres v Bd of State Auditors, 42 Mich 422, 429-430; 4 NW 274 (1880); People ex rel Drake v Univ of Mich Regents, 4 Mich 98, 101-102 (1856). Standing was a prudential limit, which is to say that the court’s decision to invoke it was “one of discretion and not of law.” Ayres, 42 Mich at 429. See, also, Toan v McGinn, 271 Mich 28, 33-34; 260 NW 108 (1935); Thompson v Secretary of State, 192 Mich 512, 522; 159 NW 65 (1916); Drake, 4 Mich at 103. The general rule was that a court would not hear a case where “an individual citizen, who is only *356 interested in common with all other citizens of the state in the subject matter of [the] complaint,” was suing a public entity to force compliance with a legal duty. Drake, 4 Mich at 101-102. Generally, the court exercised its discretion to hear a case if the citizen had “some individual interest in the subject matter of [the] complaint which is not common to all the citizens of the state ....” Id. at 103. This was sometimes articulated as a special or specific injury or interest. Inglis v Pub Sch Employees Retirement Bd, 374 Mich 10, 13; 131 NW2d 54 (1964); Hastings Bd of Ed v Gilleland, 191 Mich 276, 278; 157 NW 609 (1916); Brophy v Schindler, 126 Mich 341, 347; 85 NW 1114 (1901).
This rule was eventually applied in other cases where a party sought enforcement of a public right without a clear cause of action under the law, including where a plaintiff was seeking an injunction against a state agency on the basis that the agency’s actions were unconstitutional. Home Tel Co v Michigan R Comm, 174 Mich 219, 223-226; 140 NW 496 (1913). See, also, Gilleland, 191 Mich at 278, listing remedies to which the rule had been extended. Notably, these cases only discussed the doctrine when no cause of action was clearly provided under law and the Court was deciding whether, within its discretion, to allow the party to bring the claim despite the lack of an express cause of action. Further, the standing inquiry was distinct from the merits of the case. Thus, although the Court sometimes reached the merits of a case despite concluding that a party lacked standing, the Court did not find it necessary to determine whether a party’s claim had merit in order to determine whether a party had standing.
References to standing became more frequent in Michigan’s modern jurisprudence, and the doctrine was developed more extensively but remained a prudential *357 limit that could, within the Court’s discretion, be ignored.[3] Further, the fact that there was a cause of action under law, or the Legislature expressly conferred standing, was sufficient to establish standing.[4] Where a party was seeking declaratory relief, the Court repeatedly held that meeting the requirements of the court rule governing declaratory actions was sufficient to establish standing. House Speaker v Governor, 443 Mich 560, 572-573; 506 NW2d 190 (1993); Allstate, 442 Mich at 69-70; Sloan v Madison Hts, 425 Mich 288, 294-295; 389 NW2d 418 (1986). See, also, East Grand Rapids Sch Dist v Kent Co Tax Allocation Bd, 415 Mich 381, 392-395; 330 NW2d 7 (1982); Workman v Detroit Auto Inter-Ins Exch, 404 Mich 477, 492 n 1; 274 NW2d 373 (1979); Shavers v Attorney General, 402 Mich 554, 588-592; 267 NW2d 72 (1978). The Court also reaffirmed that “[standing does not address the ultimate merits of the substantive claims of the parties.” Detroit Fire Fighters Ass’n, 449 Mich at 633 (opinion by Weaver, J.). See also Eide v Kelsey-Hayes Co, 431 Mich *358 26, 50 n 16; 427 NW2d 488 (1988) (opinion by Griffin, J.) (treating standing as an inquiry that was distinct from whether the plaintiffs requested remedy was available).
While the doctrine continued to serve the purpose of ensuring “sincere and vigorous advocacy” by litigants, over time the test for satisfying this requirement was further developed. In cases involving public rights, the Court held that a litigant established standing by demonstrating a “substantial interest [that] will be detrimentally affected in a manner different from the citizenry at large.” House Speaker, 443 Mich at 572 (quotation marks and citations omitted). Additionally, however, the Court recognized that even if a statute did not expressly grant standing, it could be implied from duties created by law. See Romulus City Treasurer v Wayne Co Drain Comm’r, 413 Mich 728, 741; 322 NW2d 152 (1982) (stating that there were cases in which “standing was not expressly granted by statute [but] standing was implied by the duties and obligations that were expressly stated)”. Thus, where a statute did not expressly grant standing, this Court would consider whether the Legislature nonetheless intended to confer standing on the plaintiffs.[5] Bradley v Saranac Bd of Ed, 455 Mich 285, 296; 565 NW2d 650 *359 (1997); Bowie v Arder, 441 Mich 23, 42; 490 NW2d 568 (1992); Girard v Wagenmaker, 437 Mich 231, 235; 470 NW2d 372 (1991); Shavers, 402 Mich at 587. In a case involving private rights, the Court explained that the litigant should have “some real interest in the cause of action, or a legal or equitable right, title, or interest in the subject matter of the controversy.” Bowie, 441 Mich at 42 (quotation marks and citation omitted).
In summary, standing historically developed in Michigan as a limited, prudential doctrine that was intended to “ensure sincere and vigorous advocacy” by litigants. If a party had a cause of action under law, then standing was not an issue. But where a cause of action was not provided at law, the Court, in its discretion, would consider whether a litigant had standing based on a special injury or right or substantial interest that would be detrimentally affected in a manner different from the citizenry at large, or because, in the context of a statutory scheme, the Legislature had intended to confer standing on the litigant. It was not necessary to address the merits of the case in order to address standing.
B. THE LEE/CLEVELAND CLIFFS STANDING DOCTRINE
Despite the consistency of the historical development of the standing doctrine in Michigan, Lee and its progeny abruptly departed from precedent and radically changed the standing doctrine. This doctrine’s flaws are many.
1. OVERVIEW OF THE LEE/CLEVELAND CLIFFS MAJORITY’S APPROACH TO STANDING
In Lee, a majority of the Court determined, for the first time in Michigan jurisprudence, that standing was required by the Michigan Constitution, and, further, that *360 Michigan’s standing doctrine should be abandoned in favor of the standing doctrine adopted by the United States Supreme Court in the context of the federal constitution. The reasoning presented in Lee, and expanded in Cleveland Cliffs, is that standing is essential to Michigan’s separation of powers doctrine. See Lee, 464 Mich at 735. The Lee/Cleveland Cliffs majority explained that Article III, § 1 of the federal constitution grants federal courts only the “judicial power” and Article III, § 2 limits the judicial power to certain “Cases” or “Controversies.” Lee, 464 Mich at 735. Although the Michigan Constitution does not include “Cases” or “Controversies” requirements, the Lee/Cleveland Cliffs majority concluded that the Michigan Constitution is analogous to the federal constitution because it expressly requires the separation of powers and grants courts only the judicial power. Cleveland Cliffs, 471 Mich at 615; Lee, 464 Mich at 737-738. The majority further determined that the cornerstone of the judicial power is the case-or-controversy requirement. Id.[6] The Lee/Cleveland Cliffs majority thus concluded that Michigan should adopt the federal constitutional standing test from Lujan v Defenders of Wildlife, 504 US 555, 560; 112 S Ct 2130; 119 L Ed 2d 351 (1992), as the “irreducible constitutional minimum of standing... [7]
*361 The Lee/Cleveland Cliffs majority also held that a litigant must meet the Lujan standing requirements regardless of whether the Legislature expressly created a cause of action or conferred standing on the litigant because, although the Legislature has the power to create causes of actions, it does not have the power to expand the judicial authority granted to the courts by the Michigan Constitution. See Mich Citizens for Water Conservation v Nestlé Waters North America Inc, 479 Mich 280, 302-303; 737 NW2d 447 (2007). The Court also held that a litigant must meet Lujan’s requirements in order to bring a declaratory action. Associated Builders & Contractors v Dep’t of Consumer & Indus Servs Dir, 472 Mich 117, 124-127; 693 NW2d 374 (2005). Thus, after Lee and its progeny, little remained of the historical limited, prudential approach to standing, and the doctrine was significantly expanded.
2. CRITICISMS OF THE LEE/CLEVELAND CLIFFS MAJORITY’S APPROACH TO STANDING
The flaws in the Lee/Cleveland Cliffs approach are many.[8] Perhaps most egregiously, however, the Lee/Cleveland Cliffs majority dramatically distorted Michigan jurisprudence to invent out of whole cloth a constitutional basis for the standing doctrine and then, perplexingly, determined that Michigan’s standing doc *362 trine should be essentially coterminous with the federal doctrine, despite the significant differences between the two constitutions and the powers held by the respective court systems. There is no support in either the text of the Michigan Constitution or in Michigan jurisprudence, however, for recognizing standing as a constitutional requirement or for adopting the federal standing doctrine.
To begin with, there is no textual basis in the Michigan Constitution for concluding that standing is constitutionally required, and there are important differences between the two constitutions. The Michigan Constitution provides for the separation of powers between the legislative, judicial, and executive branches and vests the courts with the judicial power. Const 1963, art 3, § 2; art 6, § 1. The federal constitution similarly vests the judicial power in the courts. US Const, art III, § 1. Unlike the Michigan Constitution, however, the federal constitution enumerates the cases and controversies to which the judicial power extends, and the federal standing doctrine is largely derived from this Article III case-or-controversy requirement. See Lujan, 504 US at 560 (stating that “the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III)”. Additionally, strictly interpreting the judicial power of Michigan courts to be identical to the federal courts’ judicial power does not reflect the broader power held by state courts. Whereas federal courts only have the powers enumerated in the United States Constitution, the states retain powers not ceded to the federal government. US Const, Am X. See also Cleveland Cliffs, 471 Mich at 683-684 (KELLY, J, concurring). As this Court has stated, in Michigan, “[w]hile the legislature obtains legislative power and the courts receive judicial power by grant in the State Constitution, the whole of such power reposing in the sovereignty is granted to those bodies except as it may *363 be restricted in the same instrument.”[9] Washington-Detroit Theatre Co v Moore, 249 Mich 673, 680; 229 NW 618 (1930). Given that the text of the Michigan Constitution lacks an express basis for importing the federal case-or-controversy requirement into Michigan law, the justification for doing so, if one can be found, must lie elsewhere.
The Cleveland Cliffs majority dismissed the lack of a textual case-or-controversy requirement in the Michigan Constitution as irrelevant because it held that the case- or-controversy requirement is a limitation inherent in the judicial power.[10] However, even assuming arguendo that the judicial power implicitly extends only to cases or controversies, there is no basis for rejecting the understanding Michigan courts traditionally had of this power to instead give it the same meaning it has in the very different context of the federal constitution. This conclusion is certainly not required by federal law, as the United States Supreme Court has “recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability____” ASARCO Inc v Kadish, 490 US 605, 617; 109 S Ct 2037; 104 L Ed 2d 696 (1989).[11] There is also *364 no basis for doing so in Michigan law, as this Court long ago explained that Michigan courts’ judicial power to decide controversies was broader than the United States Supreme Court’s interpretation of the Article III case-or-controversy limits on the federal judicial power because a state sovereign possesses inherent powers that the federal government does not. Washington-Detroit Theatre Co, 249 Mich at 679-680.[12]
*365 Most importantly, however, not only does the federal standing jurisprudence have no basis in Michigan law, it is contrary to it. As explained above, before Lee, the standing doctrine was not treated as a constitutional requirement in Michigan jurisprudence; that is, the Court never concluded that a lack of standing equated to the lack of a controversy necessary for the invocation of the judicial power under the Michigan Constitution. As discussed, before Lee, from the doctrine’s inception this Court has at times addressed a case’s merits despite concluding that the parties lacked standing. And, more generally, before Lee, “controversy” was never interpreted, as it is under Lujan, to refer only to instances where the party suffered a concrete and particularized injury caused directly by the challenged conduct. Thus, the Michigan Constitution does not compel adoption of the federal standing doctrine, and there is no support for doing so in this Court’s historical jurisprudence.
Indeed, the Lee/Cleveland Cliffs majority, and the dissent in this case, make unsupported logical, or, rather, illogical, leaps. They expend significant energy explaining that Michigan law has historically required a case or a controversy to invoke the judicial power. See, e.g., Cleveland Cliffs, 471 Mich at 626-628. Then, citing only cases that stand for that limited proposition, and without distinguishing or overruling the volume of precedent discussed in this opinion, they conclude that simply because this Court has stated that the judicial *366 power extends to cases and controversies, standing is therefore required by the Michigan Constitution and must be equivalent to the federal standing doctrine adopted in Lujan. Id. at 628-629. They utterly fail to explain, however, why decades of Michigan standing jurisprudence must be sacrificed on the altar of the United States Supreme Court’s interpretation of the federal case-or-controversy requirement, despite the lack of support in Michigan caselaw for understanding a “controversy” to exist only in the same, limited circumstances explained in Lujan and despite the conflict with Michigan’s historic approach to standing.
C. STARE DECISIS
In light of the fact that the Michigan Constitution’s reference to the judicial power does not inherently incorporate the federal case-or-controversy requirement, and, in fact, importing this requirement is inconsistent with this Court’s historical view of its own powers and the scope of the standing doctrine, the question arises as to whether this Court should continue to apply the Lee/Cleveland Cliffs doctrine. Under the longstanding doctrine of stare decisis, “principles of law deliberately examined and decided by a court of competent jurisdiction should not be lightly departed.” Brown v Manistee Co Rd Comm, 452 Mich 354, 365; 550 NW2d 215 (1996) (quotation marks and citations omitted). The importance of the stare decisis doctrine is well established, for, as Alexander Hamilton stated, to “ ‘avoid an arbitrary discretion in the courts, it is indispensable that [courts] should be bound down by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them ....’” Petersen v Magna Corp, 484 Mich 300, 314-315; 773 NW2d 564 (2009) (opinion by Kelly, *367 C.J.), quoting The Federalist No. 78, p 471 (Alexander Hamilton) (Clinton Rossiter ed, 1961). As the United States Supreme Court has stated, the doctrine “promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.” Payne v Tennessee, 501 US 808, 827; 111 S Ct 2597; 115 L Ed 2d 720 (1991).
Despite its importance, stare decisis is neither an “inexorable command,” Lawrence v Texas, 539 US 558, 577; 123 S Ct 2472; 156 L Ed 2d 508 (2003), nor “a mechanical formula of adherence to the latest decision,” Helvering v Hallock, 309 US 106, 119; 60 S Ct 444; 84 L Ed 604 (1940). Ultimately, it “attempts to balance two competing considerations: the need of the community for stability in legal rules and decisions and the need of courts to correct past errors.” Petersen, 484 Mich at 314 (opinion by Kelly, C.J.). To reflect this balance, while there is a presumption in favor of upholding precedent, this presumption may be rebutted if there is a special or compelling justification to overturn precedent. Id. at 319-320. In determining whether a special or compelling justification exists, a number of evaluative criteria may be relevant, id.,[13] but overturning precedent requires more than a mere belief that a case was wrongly decided, see Brown, 452 Mich at 365.[14]
*368 In this case, the question is whether there is a special or compelling justification to overrule the LeelCleveland Cliffs majority’s decision to dramatically depart from this Court’s deeply rooted standing doctrine. We hold that there is.
To begin with, a case may be given less deference when it was an abrupt departure from longstanding precedent and lacks a constitutional basis. Adarand Constructors, Inc v Peña, 515 US 200, 231-234; 115 S Ct 2097; 132 L Ed 2d 158 (1995). In such cases, “[b]y refusing to follow [the erroneous precedent], then, we do not depart from the fabric of the law; we restore it.” *369 Id. at 233-234. As discussed, Lee and its progeny departed dramatically from historical jurisprudence in Michigan, and the bounds of the constitutional text, when they interpreted the Michigan Constitution to compel a standing doctrine that is essentially coterminous with the federal standing doctrine. Thus, by reinstating the decades-old precedent from which Lee departed, we are restoring, not departing from, the fabric of the law and this Court’s fidelity to the Michigan Constitution.[15]
Further, regardless of the level of deference due Lee and Cleveland Cliffs, there is a compelling justification to overrule the standing doctrine adopted in those cases. I find several evaluative criteria to be relevant, including: (1) “whether the rule has proven to be intolerable because it defies practical workability”; (2) “whether reliance on the rule is such that overruling it would cause a special hardship and inequity”; (3) “whether upholding the rule is likely to result in serious detriment prejudicial to public interests”; and (4) “whether the prior decision was an abrupt and largely unexplained departure from precedent.” Petersen, 484 Mich at 320.[16]
*370 The first criterion weighs slightly in favor of affirming the Lee/Cleveland Cliffs standing doctrine because, although confusion sometimes arises over the application of the factors, the test does not rise to the level of defying practical workability.
The second criterion, the strength of reliance on the rule, weighs in favor of overruling Lee and Cleveland Cliffs because it seems unlikely that potential future defendants, including the government, have been violating laws on the basis of the assumption it could not be challenged because no party would have standing under Lee to do so. To the extent that such interests exist, they are not the type of reliance interests that this Court seeks to protect.
The third criterion weighs heavily in favor of overruling Lee because the doctrine is likely to result in serious detriment to the public interest. The purpose of the standing doctrine in Michigan has always been to “ensure sincere and vigorous advocacy.” But the LeefCleveland Cliffs standing doctrine is, at the expense of the public interest, broader than this purpose because it may prevent litigants from enforcing public rights, despite the presence of adverse interests and parties, and regardless of whether the Legislature intended a private right of enforcement to be part of the statute’s enforcement scheme. As noted by Chief Justice Kelly’s Cleveland Cliffs concurrence, the Lee/Cleveland Cliffs standing doctrine “creates a self-inflicted wound” that prevents the Court from serving justice and protecting the public interest. Cleveland Cliffs, 471 Mich at 689. Further, as many commentators have noted, the federal standing doctrine has the effect *371 of encouraging courts to decide the merits of a case under the guise of merely deciding that the plaintiff lacks standing, thus using “standing to slam the courthouse door against plaintiffs who are entitled to full consideration of their claims on the merits.” Valley Forge Christian College v Americans United for Separation of Church & State, 454 US 464, 490; 102 S Ct 752; 70 L Ed 2d 700 (1982) (Brennan, J., dissenting) (quotation marks and citation omitted).[17] Thus, the Lee/Cleveland Cliffs standing doctrine is overly broad compared to the doctrine’s historical purpose and development and unjustifiably “slams the courthouse door” on numerous controversies that present legitimately adverse parties and interests.
Finally, the fourth criterion weighs heavily in favor of overruling precedent because, as discussed above, by adopting the Lujan test as a constitutionally required standing doctrine, the majority casually displaced decades of inconsistent precedent without notice or adequate explanation and thus implemented an abrupt and insufficiently explained departure from precedent.
In light of these considerations, we hold that Lee and its progeny should be overruled.[18]
*372 D. THE PROPER STANDING DOCTRINE
1. OVERVIEW OF THE PROPER APPROACH TO STANDING
The question then becomes what standing doctrine this Court should adopt in lieu of Lee/Cleveland Cliffs. We hold that Michigan standing jurisprudence should be restored to a limited, prudential doctrine that is consistent with Michigan’s longstanding historical approach to standing.[19] Under this approach, a litigant has standing whenever there is a legal cause of action. Further, whenever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment.[20] Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing. A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant.
*373 2. APPLICATION OF THE STANDING DOCTRINE TO THIS CASE
The next question is whether, in this case, plaintiffs have standing. Plaintiffs seek a declaratory judgment, a writ of mandamus, and injunctive relief.[21] We hold that plaintiffs have standing to pursue at least some of their claims.
To begin with, under the proper approach to standing, plaintiffs may seek a declaratory judgment if the requirements in MCR 2.605 are met. We remand to the Court of Appeals to decide whether plaintiffs meet the requirements of MCR 2.605 because it did not previously address this issue.
Further, we must decide whether plaintiffs have standing to pursue the rest of their claims because the Revised School Code, MCL 380.1 et seq., does not create an express cause of action or expressly confer standing on plaintiffs to enforce the act’s provisions.[22] We hold that, in this case, plaintiffs have standing because they have a substantial interest in the enforcement of MCL 380.1311a(l) that will be detrimentally affected in a manner different from the citizenry at large if the statute is not enforced.
*374 To begin with, the text of MCL 380.1311a itself suggests that plaintiffs have a substantial and distinct interest. It requires that a qualifying student be expelled for physically assaulting an employee of the school, which is defined to include the plaintiff-teachers. Given that the students are expelled for assaulting employees of the school, and not the citizenry at large, it is apparent from the statute that the plaintiff-teachers have a substantial interest in the enforcement of this provision distinct from the general public. The members of the general public might never be in a school, and, even for those who are, an assault on those members would not necessarily lead to the expulsion of the assaultive student.
Moreover, the legislative history to the 1999 legislative amendments that adopted MCL 380.1311a(l) into the Revised School Code make clear that the purpose of the section is to create a safer school environment and, even more specifically, a safer and more effective working environment for teachers.[23] The enrolled analysis of the public act adopting the amendments explained that *375 the rationale for their enactment is that “[i]n Michigan, school safety is an ongoing concern,” and, although an earlier public act “addresses several aspects of school violence, additional concerns remain,” and “[i]n particular, it has been suggested that students should be expelled or suspended when they physically or verbally assault teachers or other school personnel...Senate Legislative Analysis, SB 183, SB 206, HB 4240, and HB 4241, July 21,1999. The analysis explains that the arguments in favor of the act included that “additional measures are necessary to create and maintain a safe educational environment” because “[tjeachers who are subject to student assaults cannot effectively teach, and pupils who feel endangered cannot learn.” (Emphasis added.) It further explained that “[s]ince just one miscreant can disrupt an entire classroom, and a handful can ruin the atmosphere of a school, removing these individuals will promote efforts to educate and to learn, as well as protect the physical safety of school personnel and students” and concluded by explaining that “[a] comprehensive State approach toward student violence should deter future assaults and other disciplinary problems.” (Emphasis added.) In other words, the legislative history of the act indicates that the intended purposes of MCL 380.1311a(l) are exactly what common sense would suggest based on the statutory text: to make the school and classroom environment safer in general and specifically to protect teachers’ physical safety and their ability to effectively teach by removing miscreants and assisting in deterring future assaults. The plaintiff-teachers’ affidavits indicate that, consistent with these purposes, the alleged *376 failure of the school board to comply with the statute increases the threat to their safety.
In light of these purposes, and the plaintiff-teachers’ affidavits, it is even more clear that teachers have a substantial interest in the enforcement of MCL 380.1311a(l) that is distinct from that of the general public. The legislative history specifically contemplates that the statute is intended to not only make the general school environment safer but additionally to specifically protect teachers from assault and to assist them in more effectively performing their jobs. These are hardly interests that are shared by the general public.[24] Thus, teachers who work in a public school have a significant interest distinct from that of the general public in the enforcement of MCL 380.1311a(l).
We agree that, as stated by the dissent, the issue in this case is whether “a teacher [can] sue a school board for its failure to expel a student who allegedly assaulted *377 that teacher[.]” Post at 390. In its many erroneous blanket statements about what we are holding today, the dissent seems to assume that we have answered that question with a definitive “yes.” To the contrary, however, we have not. We have only held that if a teacher cannot sue the school board for allegedly failing to comply with MCL 380.1311a(1), standing is not the reason why. In their motion for summary disposition, defendants raised several arguments as to why plaintiffs cannot sue the school board besides standing, including that plaintiffs have failed to plead a cause of action and that their claims fail as a matter of law.[25] Plaintiffs appealed those issues. Because the Court of Appeals decided the case on the basis of standing alone, and did not reach the other issues, we remand to that Court to address the remaining issues.[26]
*378 In summary, we hold that plaintiffs have standing because plaintiffs have a substantial interest in the enforcement of MCL 380.1311a(l) that is detrimentally affected in a manner distinct from that of the general public if the statute is not enforced.
III. CONCLUSION
We overrule the standing test adopted in Lee and its progeny and restore Michigan standing jurisprudence to be consistent with the doctrine’s longstanding, prudential roots. We reverse the Court of Appeals judgment and remand to that Court to determine whether plaintiffs meet the requirements of MCR 2.605. Further, because we hold that plaintiffs have standing to pursue their remaining claims, we also remand to the Court of Appeals for consideration of the issues that it did not previously reach.
KELLY, C.J., and WEAVER (except for part II[C]) and HATHAWAY, JJ., concurred with Cavanagh, J.

 Cathy Stachwick alleges that a seventh grader threw a leather wristband with metal spikes towards her back, and the wristband bounced off the blackboard and struck her in the head. Penny Filonczuk and Ellen Wheeler allege that students in sixth grade or higher intentionally threw chairs at them. Elizabeth Namie alleges that a student in grade six or higher intentionally slapped her back.

 MCL 380.1311a(l) provides in relevant part that “[i]f a pupil enrolled in grade 6 or above commits a physical assault at school against a person employed by or engaged as a volunteer or contractor by the school board,” and the assault is reported to the school, then the school board “shall expel the pupil from the school district permanently .. . .”

 See Detroit City Council v Detroit Mayor, 449 Mich 670, 679 n 10; 537 NW2d 177 (1995) (stating that the Court was not reaching the standing issue because the parties did not raise or brief it); People v Kevorkian, 447 Mich 436, 447 n 1; 527 NW2d 714 (1994) (opinion by Cavanagh, C.J., and Brickley and Griffin, JJ.) (noting that it was not addressing standing because the parties had not raised it); Auto Club Ins Ass’n v Frederick & Herrud, Inc (After Remand), 443 Mich 358, 371-372; 505 NW2d 820 (1993) (noting that federal courts had split on whether subrogees had standing to sue under a federal act but the Court would permit a subrogee to sue “as a matter of public policy”); Blue Cross & Blue Shield of Mich v Governor, 422 Mich 1, 103 n 6; 367 NW2d 1 (1985) (opinion by Levin, J.) (deciding to give a decision on the merits regardless of whether the plaintiff had standing because “this litigation has been pending for a number of years and the Legislature and the people need a decision”).

 See, generally, Nemeth v Abonmarche Dev, Inc, 457 Mich 16, 45; 576 NW2d 641 (1998) (Cavanagh, J., dissenting) (discussing the historical importance and validity of the Michigan environmental protection act’s citizen-standing provision); see, also, Walterhouse v Ackley, 459 Mich 924 (1998); Frame v Nehls, 452 Mich 171, 177-178; 550 NW2d 739 (1996).

 Although the Court splintered on how to articulate when standing could be implied from a statutory scheme that does not expressly grant standing in the last major pre-Lee case addressing this issue, Detroit Fire Fighters Ass’n, Justice Weaver’s lead opinion articulated general principles consistent with the historical approach. Detroit Fire Fighters Ass ’n, 449 Mich at 633. Further, Justice Mallett’s statement that the key issue is “whether the plaintiff can demonstrate any special right, injury, or zone of interest that deserves the protections of the law,” is consistent with the historical doctrine. Id. at 663 (Mallett, J., concurring in the result only). Justice Riley’s concurrence, however, erred in conflating the distinct inquiries of whether a plaintiff has standing under a statutory scheme and whether there is an implied statutory cause of action. Id. at 644-645.

 Lee cited older Michigan caselaw to define the judicial power as “the power to hear and determine controversies between adverse parties, and questions in litigation,” and “the authority to hear and decide controversies, and to make binding orders and judgments respecting them.” Lee, 464 Mich at 738, quoting Daniels v People, 6 Mich 381, 388 (1859), and Risser v Hoyt, 53 Mich 185, 193; 18 NW 611 (1884) (emphasis omitted). The Cleveland Cliffs majority, however, only cited federal caselaw in support of its contention that “[pjerhaps the most critical element of the ‘judicial power’ has been its requirement of a genuine case or controversy between the parties . . . .” Cleveland Cliffs, 471 Mich at 615.

 The test requires that the plaintiff show (1) an injury-in-fact, meaning the “invasion of a legally protected interest which is (a) concrete and *361 particularized, and (b) actual or imminent, not conjectural or hypothetical”; (2) causality, meaning that the injury is “fairly tracefable]” to the challenged conduct; and (3) redressability, meaning that it is “likely” that a favorable decision would “redress” the injury. Lee, 464 Mich at 739 (quotation marks and citation omitted).

 Only the fundamental legal error most relevant to the stare decisis analysis will be reviewed because other criticisms have been thoroughly addressed in various opinions of this Court. For further discussion, however, see, e.g., Cleveland Cliffs, 471 Mich at 651-675, (Weaver, J., concurring); Mich Citizens for Water Conservation, 479 Mich at 310-322 (Weaver, J., dissenting).

 As noted in Justice Weaver’s Cleveland Cliffs concurring opinion, and discussed in her concurrence in this case, adopting standing as a constitutional doctrine potentially may even violate the separation of powers doctrine under the Michigan Constitution. Cleveland Cliffs, 471 Mich at 668-669.

 The Cleveland Cliffs majority dismissed the cases-or-controversies requirements in art III, § 2 of the federal constitution as merely explaining the types of cases and controversies over which the Court had jurisdiction, rather than as the source of the case-or-controversy requirement itself, which it considered to be inherent in the grant of judicial power in art III, § 1. 471 Mich at 626-627.

 As the dissent notes, some of our sister states have chosen to adopt a standing doctrine similar to the Lujan test. But, of course, other states’ *364 courts’ interpretations of their own constitutions are not binding or even necessarily instructive with regard to our interpretation of the Michigan Constitution. Furthermore, many states have either declined to adopt the Lujan standing test or do not apply it exclusively. See, e.g., Kellas v Dep’t of Corrections, 341 Or 471, 478; 145 P3d 139 (2006) (noting that “[t]he Oregon Constitution contains no ‘cases’ or ‘controversies’ provision” and declining to “import federal law regarding justiciability into our analysis of the Oregon Constitution and rely on it to fabricate constitutional barriers to litigation with no support in either the text or history of Oregon’s charter of government”). See also Coalition for Adequacy & Fairness in School Funding, Inc v Chiles, 680 So 2d 400, 403 (Fla, 1996) (holding that a citizen taxpayer has standing to challenge the legislature’s exercise of its taxing and spending power without demonstrating a special injury and stating that “in Florida, unlike the federal system, the doctrine of standing has not been rigidly followed”); Lebron v Gottlieb Mem Hosp, 2010 Ill LEXIS 26, *52 (Ill, 2010) (explaining that “[t]his court is not required to follow federal law on issues of standing, and has expressly rejected federal principles of standing”); Nefedro v Montgomery Co, 2010 Md LEXIS 210, *8 n 3 (Md, 2010) (explaining that the Lujan standing doctrine did not apply because it “is not applicable to state courts”); Tax Equity Alliance for Massachusetts v Comm’r of Revenue, 423 Mass 708, 714; 672 NE2d 504 (1996) (explaining that under Massachusetts’s “public right doctrine,” a citizen has standing to “seek relief in the nature of mandamus to compel the performance of a duty required by law”); Jen Electric, Inc v Essex Co, 197 NJ 627, 645; 964 A2d 790 (2009) (explaining that, in New Jersey, “[sjtanding is a creature of the common law” and a “liberal ruleQ” because “overall we have given due weight to the interests of individual justice, along with the public interest, always bearing in mind that throughout our law we have been sweepingly rejecting procedural frustrations in favor of just and expeditious determinations on the ultimate merits”) (quotation marks and citations omitted).

 The dissent offers quotations from delegates to the Michigan Constitutional Convention to support its position that the judicial power extends only to cases or controversies. Even setting aside whether there is a truly logical distinction between the dissent’s criticisms of the use of *365 legislative history to interpret a statute and its use of a delegate’s preenactment impressions of constitutional text to interpret that text, these quotations provide no support that any delegate believed that standing was a constitutional requirement. They merely demonstrate that certain delegates believed that the judicial power extended to cases and controversies, which, at that time, had never been interpreted to incorporate standing as a constitutional requirement in Michigan.

 In Petersen, Chief Justice Kelly provided a nonexhaustive list of criteria that may be considered, but none of the criteria are determinative, and they need only be evaluated if relevant. See Petersen, 484 Mich at 320.

 In addition to firing its standard shot impugning my commitment to the doctrine of stare decisis, today the dissent also claims that the justices of this Court must adopt a uniform approach to stare decisis and criticizes me for applying a “minority” approach rather than Robinson v Detroit, 462 Mich 439, 464-466; 613 NW2d 307 (2000). As discussed in *368 concurrences by Justice Weaver and Justice Hathaway, however, justices may take varying approaches to stare decisis. Indeed, the United States Supreme Court has not applied one strict standard or a single “commonly accepted... test,"post at 449, when considering stare decisis issues and has applied various approaches, even within the same year. For example, in Montejo v Louisiana, 556 US 778, _; 129 S Ct 2079, 2088-2089; 173 L Ed 2d 955, 967 (2009), in an opinion authored by Justice Scalia, the Court explained that “the fact that a decision has proved ‘unworkable’ is a traditional ground for overruling it.” The Court also stated that other relevant factors include “the antiquity of the precedent, the reliance interests at stake, and of course whether the decision was well reasoned.” Yet, in Pearson v Callahan, 555 US 223, 233; 129 S Ct 808; 172 L Ed 2d 565 (2009), in an unanimous opinion authored by Justice Alito, the Court stated that “[r]evisiting precedent is particularly appropriate where... a departure would not upset expectations, the precedent consists of a judge-made rule that was recently adopted to improve the operation of the courts, and experience has pointed up the precedent’s shortcomings.”
Ironically, the very doctrine and approach that the dissent claims to vehemently adhere to today was not so faithfully applied by the members of the dissent in the past. Indeed, the members of the dissent have overruled caselaw without even paying lip service to Robinson, see, e.g., People v Anstey, 476 Mich 436; 719 NW2d 579 (2006), or after engaging in a cursory, or limited, analysis of the factors that they claim fidelity to today, see, e.g., Wesche v Mecosta Co Rd Comm, 480 Mich 75, 91 n 13; 746 NW2d 847 (2008); Al-Shimmari v Detroit Med Ctr, 477 Mich 280, 297 n 10; 731 NW2d 29 (2007); Neal v Wilkes, 470 Mich 661, 667 n 8; 685 NW2d 648 (2004); People v Hickman, 470 Mich 602, 610 n 6; 684 NW2d 267 (2004); Mack v Detroit, 467 Mich 186, 203 n 19; 649 NW2d 47 (2002).

 Contrary to the mewling of the dissenters, who would enshrine their disembowelment of 10 to 50 years of this Court’s jurisprudence, in Lee and many other cases, this majority’s reversal of their recent activist efforts simply brings this Court back to the status quo ante. Indeed, the dissenters’ stare decisis protestations should taste like ashes in their mouths. Although the dissenters paid absolutely no heed to stare decisis as they denigrated the wisdom of innumerable predecessors, the dissenters would now wrap themselves in its benefits to save their recent precedent.

 The other criteria suggested by Chief Justice Kelly in Petersen are not applicable to this case or are neutral. For example, perhaps because the case was recently decided, there are no related principles of law that have eroded the rule and there are no significant changed facts or circumstances. Further, as noted, the jurisprudence from other states *370 and jurisdictions has limited value because it is based on distinct jurisprudential history and constitutions, and, regardless, there are states that have followed Lujan and there are states that have rejected it.

 See, e.g., Allen v Wright, 468 US 737, 782; 104 S Ct 3315; 82 L Ed 2d 556 (1984) (Brennan, J., dissenting), quoting numerous academic commentaries to explain that “[m]ore than one commentator has noted that the causation component of the Court’s standing inquiry is no more than a poor disguise for the Court’s view of the merits of the underlying claims.” Indeed, there is perhaps no better example of this than the dissenting opinion in this case, which, in order to apply the Lee standing test, also voluminously addressed the merits of each of plaintiffs’ claims and the availability of the remedies they sought.

 The cases extending or applying Lee and Cleveland Cliffs include: Rohde v Ann Arbor Pub Sch, 479 Mich 336; 737 NW2d 158 (2007); Mich Citizens for Water Conservation; and Mich Chiropractic Council v Comm’r of the Office of Fin & Ins Servs, 475 Mich 363; 716 NW2d 561 (2006). Further, Associated Builders & Contractors, 472 Mich at 126-127, is *372 overruled to the extent that it required a litigant to establish the Lee/Cleveland Cliffs standing requirements in order to bring an action under MCR 2.605.

 The dissent’s Chicken Little-esque wails of the impending stampede to the courthouse that will result from today’s decision ignore that we do nothing more than restore an approach to standing that is consistent with the approach that this Court followed for decades without courts being overburdened with a flood of litigation before Lee was decided a mere nine years ago.

 The pre-Lee/Cleveland Cliffs standard, which was also incorporated into Associated Builders & Contractors, remains: “The essential requirement of the term ‘actual controversy’ under the rule is that plaintiffs ‘plead and prove facts which indicate an adverse interest necessitating the sharpening of the issues raised.’ ” Associated Builders & Contractors, 472 Mich at 126, quoting Shavers, 402 Mich at 589.

 It is not disputed that, under Michigan law, an organization has standing to advocate for the interests of its members if the members themselves have a sufficient interest. See, e.g., Trout Unlimited, Muskegon-White River Chapter v White Cloud, 195 Mich App 343, 348; 489 NW2d 188 (1992). Thus, because we hold that the plaintiff-teachers have standing, and it is not disputed that the plaintiff-teachers are members of the plaintiff-organizations, the plaintiff-organizations have standing as well.

 In dicta, the Court of Appeals decision in this case suggested that there is no implied private cause of action to enforce the Revised School Code. We do not reach the merits of that issue, however, because plaintiffs are not seeking a private cause of action for damages. See, generally, Lash v Traverse City, 479 Mich 180, 196-197; 735 NW2d 628 (2007), explaining that a party may seek remedies other than monetary damages, such as declaratory relief under MCR 2.605(A)(1), against a governmental unit without having to demonstrate that a statute has an implied private right of action.

 The dissent suggests that the same limitations that apply to using legislative history to interpret a statute should be applied to determining whether a party has a substantial and distinct interest in the statute’s enforcement that is sufficient to establish standing. We disagree. If the Legislature unambiguously expresses an intent to confer standing through a statute’s text, then it would certainly be sufficient to confer standing. But the inquiry into whether a party has a substantial and distinct interest in the enforcement of the statute is a much broader inquiry for which legislative history may he instructive. Indeed, before Lee, this Court would sometimes consider legislative history in determining whether a party had standing. See, e.g., Frame v Nehls, 452 Mich 171, 176-180; 550 NW2d 739 (1996); Girard, 437 Mich at 244-247. Further, while analyzing legislative intent is essential if a party is attempting to demonstrate that the Legislature intended to confer standing or create a private right that the party would have standing to enforce, this Court has not historically found an analysis of legislative intent necessary for a party to demonstrate that the party has a substantial interest in the *375 enforcement of a statute relating to a public right that is distinct from that of the general public. See, e.g., House Speaker v State Admin Bd, 441 Mich 547; 495 NW2d 539 (1993).

 Indeed, because of this, plaintiffs’ claim to having a more substantial interest than that of the general public is greater than that of the plaintiff-firefighters in Detroit Fire Fighters Ass’n. In that case, Justice Weaver’s lead opinion explained that, in her view, firefighters did not have a substantial interest in the effects of reduced funding for the fire department that was sufficiently distinct from that of the general public because, although firefighters were subject to a greater risk of harm if the number of total firefighters was reduced, members of the public who were trapped in burning houses were also subject to a greater likelihood of injury, and, thus, “[b]oth segments of society are at greater risk when there is a dearth of fire fighters.” Detroit Fire Fighters Ass’n, 449 Mich at 638 (quotation marks and citation omitted). Other justices, including myself, would have concluded that the firefighters did have a sufficiently distinct interest to establish standing. But, regardless, it is apparent that plaintiffs’ interest in this case is even more distinct than that of the firefighters. As noted by the dissent, a teacher is more likely to be at a school, just as a firefighter is more likely to be at a fire. But whereas all members of the public are at risk of being in a building that may catch fire, all members of the public are not necessarily in schools so that they are at risk of being assaulted in a classroom or, even if they are in a school, of being affected by a less effective teaching environment.

 As discussed, the merits of a party’s claims and their right to the requested remedies were frequently intertwined in the standing analysis erroneously adopted in Lee. Indeed, the dissent in this case perfectly models this troubling aspect of that decision. But, under the proper approach to standing, the issues of whether plaintiffs have sufficiently pleaded a cause of action and are entitled to the requested remedies are independent of the standing inquiry. Indeed, the issues the dissent raises regarding whether students’ rights would be violated if a court decided to review the school board’s disciplinary hearings and discretionary decision and found that plaintiffs were entitled to an injunction expelling the students are certainly premature at this point.

 Just as the dissent’s cries that the historical standing test, in general, will lead to a stampede to the courthouse ignore that we are reversing a decision that is only nine years old, the dissent’s cries regarding the stampede of lawsuits that will result from this specific case ignore that the Revised School Code predated Lee and yet the courts were not overburdened with similar cases before Lee. The reason for this lack of lawsuits is self-evident, as standing is certainly not the only hurdle to prevailing in a case, including winning on the merits. As noted, we are not holding that there is an implied cause of action for private damages under the Revised School Code. Thus, the plaintiff-teachers seeking enforcement of MCL 380.1311a(l) must meet the requirements for some other cause of action, such as a writ *378 of mandamus under MCR 3.305 or a declaratory action under MCR 2.605(A)(1). As the dissent’s analysis indicates, these may be difficult hurdles to clear.